IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| APRIL WALKER, o/b/o C.C., | ) | Case No. 1:18-cv-0819 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff April Walker seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner") denying her application for supplemental social security

income ("SSI") on behalf of her minor child, C.C., under Title XVI of the Social Security Act.

This matter is before me pursuant to 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c)(3), and Local Rule

72.2(b).  Because substantial evidence supported the ALJ's decision and because Walker has not

identified any error of law in the ALJ's evaluation of her claim, I recommend that the final

decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Walker applied for SSI benefits on behalf of her minor child, C.C., on June 30, 2014.

(Tr. 159-160, 264-269).  The claim was denied initially and on reconsideration.  (Tr. 146-158,

161-172).  After hearings on February 22, 2017 and August 9, 2017, Administrative Law Judge

("ALJ") Jason C. Earnhart denied the claim in a decision dated September 1, 2017.  (Tr. 50-73,

80, 112).  The Appeals Council denied review of that decision, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).

III.    **Evidence**

A.    **Relevant Medical and Educational Evidence**

Walker was referred to Help Me Grow on February 15, 2012.  (Tr. 467).  C.C. was eligible for services based on a cognitive score of 84 on the Battelle Developmental Inventory.  (Tr. 486).  Walker reported that C.C. threw fits and got upset, he shook when he didn't get his way; he got angry and did not control his emotions.  By September 11, 2012, C.C. was no longer shaking but would still cry, throw himself on the floor, and hit people.  (Tr. 471).

On March 10, 2014, evaluator, Carol Wilson, wrote:

> Compared to same age peers, his language skills are low average.  His fine motor skill [*sic*] are somewhat below average. His pre-academic skills are lacking.  His gross motor skills appear to be delayed also.  Delays in these areas could have an adverse affect [*sic*] on [C.C.'s] ability to access the general educational curriculum when he goes to kindergarten.

(Tr. 345).

Also on March 10, 2014, occupational therapist, Kelly Harris, noted that C.C. "would benefit from specialized instruction in the areas of fine motor skills and visual motor skills to improve his ability to copy prewriting shapes, cut near lines and shapes, and use appropriate grasps on classroom utensils, which are part of a standard preschool curriculum."  (Tr. 348).

On June 13, 2014, C.C. began treatment at Appleseed Community Mental Health Center. ("Appleseed") (Tr. 489-501).  Walker reported C.C. would run from her when he got in trouble, hit other children for no reason, including his brother, growl at her when angry and not control his emotions.  (Tr. 471).  She also reported that he would get angry at least once a day, cry, throw things, ignore people, urinate on her friend, tell her to "shut up," and have mood swings.

2

(Tr. 496).  Based on Walker's report, C.C. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Combined Type.  (Tr. 500).

On July 21, 2014, Walker reported to Ashley Nimes, BSW, LSW, CPST, at Appleseed that C.C. had recently killed a friend's kitten while visiting their home.  (Tr. 628).

On August 26, 2014, Michelle Linton, preschool director for Head Start in Ashland County, evaluated C.C. for developmental delay in fine and gross motor skills.  An Evaluation Team Report ("ETR") and Individualized Education Plan ("IEP") were developed.  (Tr. 339-364, 612, 613).  C.C. was eligible for special education services as a preschool student with developmental delays in fine and gross motor skills.  (Tr. 351).

On September 8, 2014, state agency psychologist, Curt Ickes, Ph.D., evaluated C.C.  (Tr. 546-548).  C.C. was in preschool at the Ashland Head Start program and was on a waiting list with the Ashland County Board of Developmental Disabilities to attend the Dale-Roy School.  (Tr. 546).  All of C.C.'s developmental milestones had been delayed and his pre-academic skills were poor.  (Tr. 547).  Dr. Ickes noted overt signs of hyperactivity, constant fidgeting, talkativeness, distractibility, difficulty understanding questions, unclear speech, poor memory, poor attention and intellectual functioning in the extremely low range.  (Tr. 547).  Dr. Ickes diagnosed attention deficit hyperactivity disorder (ADHD), combined type, and mild mental retardation.  He assigned a Global Assessment of Functioning (GAF) score of 40.  In acquiring and using information, Dr. Ickes opined that C.C.'s general abilities were well below peer levels. In the domain of attending to and completing tasks, he opined that C.C.'s symptoms of ADHD made it very difficult for him to attend to and complete age appropriate tasks.  In the area of interacting and relating with others, Dr. Ickes noted that C.C. did not follow instructions and

3

occasionally acted out his frustration.  He also opined that C.C.'s ability to engage in age appropriate self-care was below the level of same-aged peers.  (Tr. 548).

After receiving additional background documentation regarding C.C., Dr. Ickes wrote an addendum to his consultative examination report on October 21, 2014.  (Tr. 551-552).  Dr. Ickes stated that cognitive deficits and developmental delays were present.  He stated that the exact level of cognitive functioning was unclear and that intelligence testing was recommended to rule out or confirm his suspicion that C.C. was within the mild mental retardation/intellectual deficit range.  He noted that his opinion concerning ADHD was based on C.C.'s mother's report.  He concluded,

> Given the complexity of this case, the fact that background information was not available prior to my evaluation, and no intelligence testing was conducted, the reliability of the conclusions drawn in my previous report is questionable. Therefore, I would recommend further assessment to determine the youngster's current level of cognitive and adaptive functioning.

(Tr. 552).

State-agency physician, Leslie Rudy, Ph.D., reviewed C.C.'s records on October 14, 2014.  Dr. Rudy opined that C.C. had severe impairments of ADHD and a learning disorder.  (Tr. 153).  She opined that he had no limitations in the domains of interacting and relating to others and moving about and manipulation of objects.  She opined that he had less than marked limitations in the domains of acquiring and using information, caring for self, and health and physical well-being.  (Tr. 153-154).  She opined that he had a marked limitation in the domain of attending and completing tasks.  (Tr. 153).  Psychologist Tonnie Hoyle affirmed the opinions of Dr. Rudy on January 26, 2015.  (Tr. 167-169).  Based on their assessments, the reviewing psychologists determined that C.C. did not functionally equal a listing.  (Tr. 155, 169).

4

On November 14, 2014, Lenora Oeftering, Director of Education for the Ashland County Board of Developmental Disabilities and Dale Roy Schools, noted that the district and the parents had determined that an integrated preschool setting at Dale Roy was a better location for C.C. to receive his specially designed instruction because it was a full day program providing more structure.  (Tr. 554).  On November 25, 2014, C.C.'s IEP was amended to reflect the change from itinerant services to classroom services due to the need for more structure.  His placement changed to Dale Roy preschool and included Section 8 transportation to/from services.  (Tr. 578).

On January 23, 2015, C.C.'s teacher, Susan Dilgard, reported that he was having difficulty with color and shape recognition; letters and numbers were even harder for him.  He could not write his name, even when looking at a model.  He was able to copy a circle, cross, and the letter L.  He counted to five out loud and could count five objects.  He acted like he didn't know what he was supposed to be doing and needed reminders to look at what his friends were doing. (Tr. 642).

Walker and C.C. started counseling at Appleseed Community Mental Health Center in June 2014.  On February 15, 2015, Walker expressed to a counselor that she was concerned that C.C. was not progressing as she had hoped in school.  She was concerned that he would always have to be in a special school.  (Tr. 637).

On March 13, 2015, Ms. Dilgard noted that C.C. knew a few more colors but still struggled with basic shape recognition.  He would get upset when corrected or reminded to follow directions.  He covered his face, cried and said he wanted to go home.  However, he was easily redirected and got over it quickly.  Ms. Dilgard also reported that C.C. participated in group activities and worked hard.  (Tr. 642).

In May 2014, Ms. Dilgard recommend that C.C. work on activities in the Summer packet. He needed to work on printing his name and letter and number recognition.  (Tr. 642).  At counseling on May 28, 2015, Walker expressed concern that C.C. was not learning.  The counselor explained that he was learning but was still not at some expectations for his age.  (Tr. 645).

C.C.'s ETR and IEP were updated on August 17, 2015 at Dale Roy School.  (Tr. 650-655).  He continued to have deficits in balance, dynamic movement and coordination.  He was able to identify shapes and colors and count to 10.  (Tr. 651).  However, he could not name numerals 0-10.  (Tr. 653).  He was working on printing his first name; he printed the letters in order, but they were not consistently going in the right direction or in a straight line.  (Tr. 651).  In physical education, C.C. was only able to freeze independently ¼ times with no movement, verbal or visual cues.  (Tr. 655).

During counseling on September 23, 2015, Walker shared her concern that C.C. wiggled too much at school and was getting in trouble.  The counselor discussed the possibility of a referral for medication for C.C.  (Tr. 713).  On October 9, 2015, Walker reported that C.C. had a hard time calming down, was generally loud and hyperactive and needed sensory input at sleep. (Tr. 712).

Dr. R. Zarko evaluated C.C. at Appleseed on December 7, 2015.  (Tr. 715-720).  C.C. was somewhat distracted.  His activity level was a bit fidgety and hyperactive at times, but he was able to sit still when eating potato chips.  He had poor expressive language ability and misused the English language.  There were no perceptual disturbances of hallucinations or delusions and his thought process was very concrete.  (Tr. 718).  He acted out things he was describing like running when he talked about running around the playground at school.  His

6

attention and concentration were somewhat impaired, his ability to abstract was not intact, and his intelligence was in the borderline range.  His judgment was poor.  Dr. Zarko diagnosed unspecified ADHD, oppositional defiant disorder, language disorder, and rule-out unspecified intellectual disability.  He assigned a GAF score of 55.  Dr. Zarko recommended follow-up after C.C. turned six for possible medication.  (Tr. 719).

C.C. continued counseling at Appleseed through July 2016.  (Tr. 710-711, 768-776).  On April 13, 2016, C.C. returned to see Dr. Zarko.  He continued to be loud and was unable to sit still.  He had a short attention span, limited cognition and limited insight and judgment.  Dr. Zarko prescribed a trial of Vyvanse.  (Tr. 777-778).  At a follow-up appointment on May 11, 2016, Walker reported that C.C. was doing a little better.  (Tr. 779-780).

C.C.'s IEP was updated on May 17, 2016.  (Tr. 722-762).  He was eligible for services based on his intellectual disability.  (Tr. 723, 759).  C.C. was able to say the letters in his name and could identify his name in print.  He was able to name some of the letters in his name in upper case but could not recognize them in lower case form.  (Tr. 724).  He could not count groups of objects like his typical peers or copy straight-line shapes like typical peers.  (Tr. 725-726).  C.C. could do group activities, but did best working one-on-one with few distractions.  He interacted well with everyone and was very helpful in the classroom.  (Tr. 723).  It was determined that C.C. would receive core instruction in the general classroom with additional instruction in the resource room and therapy location to allow for repetition, review and additional opportunities for reinforcement.  (Tr. 730).

C.C. underwent testing as part of his updated IEP.  He scored very low, on the Wechsler Individual Achievement Test.  His early reading skills score was in the >0.1 percentile, his math problem solving score was in the 3rd percentile and his alphabet writing fluency score was in the

7

.4 percentile.  (Tr. 744).  On the Adaptive Behavior Assessment System test, C.C. scored in the average range for social skill; below average in communication, functional academics, school living, leisure and self-direction; in the borderline range for health and safety and self-care; and in the extremely low range for community use.  (Tr. 746).  In composite testing he scored in the 17.5 percentile for conceptual, 32 percentile for social, 1.9 percentile for practical and 8.1 percentile for global adaptive composite.  In visual-motor testing, C.C. scored in the 18th percentile.  (Tr. 748).

C.C. and Walker saw Dr. Zarko on June 29, 2016.  Walker reported that he had been a "handful, oppositional, whiny, and throwing fits."  Dr. Zarko increased the Vyvanse dose.  (Tr. 781-782).  On August 22, 2016, Walker reported that the Vyvanse "works until 3-4:00 then stops."  (Tr. 783).

During a counseling session on August 26, 2016, C.C. became upset and angry.  He sat in the corner, hit his bottle on the ground, and repeatedly said "I want daddy."  Then, he began to laugh and stopped the behavior.  (Tr. 792).

On October 5, 2016, Walker reported that the Vyvanse was not working.  C.C. was still "really hyper."  (Tr. 797).  However, on November 20, 2016, Walker reported that, as long as C.C. was on his meds, he was okay.  (Tr. 795).

On December 5, 2016, C.C. was not compliant with the counselor's requests at the beginning of the session and became angry.  (Tr. 790).  On December 28, 2016, C.C. was oppositional again during an office visit with Dr. Zarko, but his medication was helping.  (Tr. 793-794).

On January 19, 2017, C.C.'s kindergarten teacher, Tari Mole, completed a statement regarding his overall level of functioning.  (Tr. 447-455).  Ms. Mole rated C.C.'s abilities in

8

reading, math and written language as "below average."  However, absenteeism was not a

problem.  (Tr. 447).  In the domain of acquiring and using information, Ms. Mole opined that

C.C. had an obvious problem.  (Tr. 448).  She marked that he had a serious problem in

understanding school and content vocabulary, comprehending and doing math problems,

providing organized oral explanations and adequate descriptions, expressing ideas in written

form, and applying problem-solving skills in class discussions.  Ms. Mole wrote that C.C. was "a

hard worker.  He tries and cooperates to do as expected.  However, he needs support to access

curriculum and learn to achieve what others achieve with little or no support.  He receives

support and extra help 90% of the time."  (Tr. 448).  Ms. Mole found only slight problems or no

problems in the other five domains.  (Tr. 449-454).  Ms. Mole wrote the following statements in

her report:

> I don't know his medicine routine, however I know some days when he hasn't
> had meds it is obvious in his inability to stay on task and concentrate.
>
> [C.C.] needs a lot of academic support so that he can be successful in the
> classroom.  He is cooperative and tries hard.  Without academic support he falls
> apart emotionally.

(Tr. 454).

At counseling on January 25, 2017, Walker reported that C.C. had recently become

aggressive with two of his peers.  (Tr. 789).

C.C.'s IEP was updated on February 2, 2017.  (Tr. 799-845).  He was now able to write

his first and last names and could write twelve of twenty-six letters.  (Tr. 801).  He could count

to thirty-nine but was unable to add.  (Tr. 803).  C.C. could state his name and age, but did not

know his birthday, the days of the week, or the months of the year.  (Tr. 805).  The updated plan

called for C.C. to continue core instruction in the regular education setting with small group and

practice in the resource room.  (Tr. 809).

9

Psychologist T. Rodney Swearingen evaluated C.C. on March 23, 2017.  (Tr. 846-850). Walker reported that C.C. was doing better but was still behind and disliking school.  He had an IEP and some behavior problems when he missed his medication.  C.C. was taking melatonin for sleep and Vyvanse for ADHD.  Dr. Swearingen observed that C.C. was fidgety and moving in his seat.  During the examination, C.C. was sometimes impulsive, agitated, had difficulty understanding directions and questions, needed prompting to elaborate, and his associations were concrete.  (Tr. 847.)  C.C. was suspicious and thought people watched him.  He had no compulsions.  His concentration and persistence were fair.  He was able to recall two of three words after a delay.  (Tr. 848).

On the Wechsler Intelligence Scale for Children test, C.C. scored in the 2nd percentile for verbal comprehension, in the 18th percentile for visual spatial, in the 16th percentile for fluid reasoning, in the 3rd percentile for working memory, and in the 30th percentile for processing speed.  He had a full-scale IQ of 76 (5th percentile).  However, Dr. Swearingen did not consider the full-scale IQ score to be accurate.  He diagnosed mild intellectual developmental disability, ADHD – combined presentation, and oppositional defiant disorder, moderate.  (Tr. 848).

C.C. met with Dr. Zarko in June and July 2017.  Dr. Zarko continued plaintiff's medications, even though Walker was unsure whether Vyvanse was helping.  (Tr. 864-865, 878-879).

## B.    Relevant Testimonial Evidence

The administrative hearing commenced on February 22, 2017 and reconvened on August 8, 2017.  C.C. testified at the hearing.  He had taken his medication that day but the ALJ found him very animated.  He testified that he had not eaten breakfast or lunch that day.  However, Walker stated that C.C. had eaten breakfast and was lying about that.  C.C. testified that he did

not get into trouble at school, that he had two friends at school, and that he liked to play video games. (Tr. 117-122).

Walker also testified at the hearing. She testified that she faithfully gave medicine to C.C. The medicine improved his behavior. C.C.'s father had forgotten to give C.C. his medicine on two occasions, but Walker denied forgetting to give medicine to C.C. C.C. was receiving special services at school for his academics. He did not get along with his two brothers. (Tr. 122-130).

A medical expert, Dr. Michael Lace, also testified at the hearing. Dr. Lace testified that he had reviewed the whole record. He did not consider the IQ score of 64 to be valid. There was no indication whether C.C. had taken medication before the testing, and he thought further testing was necessary. Dr. Lace considered Listings 112.05, 112.08 and 112.11 but opined that C.C. did not meet any of the Listings. He opined that C.C. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and in interacting and relating to others. Dr. Lace opined that C.C. had no limitations in the domains of moving about and manipulating objects, caring for self, and physical well-being. Following Dr. Lace's testimony, the ALJ ordered that C.C. take another I.Q. test. (Tr. 130-143).

The hearing reconvened on August 8, 2017. C.C. was getting ready to enter first grade. (Tr. 87). He had taken another IQ test resulting in increases scores. A new medical examiner, Dr. Mary Buban, reviewed the record and the new IQ test results. (Tr. 97-107). She opined that C.C. was functioning in the borderline intellectual range and was continuing to make progress. She opined that he had less than marked limitations in five of the domains (acquiring and using information, attending and completing tasks, interacting with others, moving about and

11

manipulating objects and caring for self.)  Dr. Buban deferred to the medical examiners'

opinions on C.C.'s domain of overall health and well-being.  (Tr. 102).

## IV.     The ALJ's Decision

The ALJ's September 1, 2017 decision included the following findings relevant to this

appeal:

3. C.C. had the following severe combination of impairments:  asthma, and
   personality and neurodevelopmental disorders.  (Tr. 56).

4. C.C. did not have an impairment or combination of impairments that met or
   medically equaled the severity of the criteria for any listed impairment.  (Tr.
   57).

5. C.C. did not have an impairment or combination of impairments that
   functionally equaled the severity of the criteria of the childhood listings.  (Tr.
   59).

   - C.C. had less than marked limitations in acquiring and using information.
     (Tr. 64).

   - He had less than marked limitations in attending and completing tasks.
     (Tr. 66).

   - He had less than marked limitations in interacting and relating with others.
     (Tr. 67).

   - He had less than marked limitations in moving about and manipulating
     objects.  (Tr. 69).

   - He had less than marked limitations in caring for self.  (Tr. 71).

   - And, he had less than marked limitations in his health and physical well
     being.  (Tr. 72).

Based on all his findings, the ALJ determined that C.C was not disabled.  (Tr. 72).

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The court may not try the case de novo, resolve conflicts in evidence, or independently decide questions of credibility.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997).  If supported by substantial evidence and decided under the correct legal standard, the Commissioner's decision must be affirmed even if this court would have decided the matter differently, and even if substantial evidence also supports the claimant's position.  *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec*. 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not

13

build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The standard for evaluating a child disability claim differs from that used for an adult's claim. 42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec*., 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if she has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the

14

Commissioner must assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  This is done by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations[1] in two or more domains, or an "extreme" limitation[2] in one domain, the impairments are deemed to functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

### B.    Substantial Evidence Supports the ALJ's Findings

Walker argues that the ALJ's findings that C.C. had less than marked limitations in the six domains lacked substantial support from evidence in the record.  She contends that the evidence supported a finding that C.C. met Listing 112.05(B) and a finding of marked limitations in the functional domains of acquiring and using information and in attending and completing tasks.

### 1.    Listing 112.05(B)

Walker argues that the ALJ erred in finding that C.C. did not meet the criteria of Listing 112.05(B) (Intellectual Disorder for children age 3 to 18).  Listing 112.05(B) is satisfied by meeting both of the following criteria:

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

1.  Significantly subaverage general intellectual functioning evidenced by a or b:

    a.  A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

    b.  A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.  Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    a.  Understand, remember, or apply information (see 112.00E1); or

    b.  Interact with others (see 112.00E2); or

    c.  Concentrate, persist, or maintain pace (see 112.00E3); or

    d.  Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404 Subpt. P., App. 1 § 112.05(B).

The ALJ determined that C.C. did not meet Listing 112.05(B) because he did not have an extreme or marked limitation in any of the areas of mental functioning.  (Tr. 58).  In support of his decision, the ALJ cited extensively from the record and relied on the hearing testimony of the medical experts.  (Tr. 58-59).

Walker complains that the ALJ conflated evidence from a three-year time span in making his findings.  ECF Doc. 11 at Page ID# 942.  However, she cites no authority that would prohibit an ALJ from considering the evidence in the record covering a three-year span.  Walker also takes issue with the ALJ's finding that C.C. "attended preschool with typically developing peers and there was no evidence of learning barriers and repeated grades."  (Tr. 58).  Walker argues that this is a mistake of fact.  She argues that C.C.'s ETR consistently required specialized placement due to his intellectual disability.  ECF Doc. 11 at Page ID# 943.  The record partly

supports Walker's assertion.  But it also supports the ALJ's findings.  The record shows that C.C. attended a preschool with typically developing peers (Tr. 660), that he had not repeated any grades, and had no learning barriers.  (Tr. 493).   The ALJ's statement was taken directly from the record; it was not a mistake of fact.

Walker cites different portions of the record to support of her argument that C.C. had significant learning barriers.  ECF Doc. 11 at Page ID# 943.  But, "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  The substantial-evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."  *Id.* (citation omitted).  So long as a "reasonable mind might accept the evidence as adequate to support [his] conclusion," the court must defer to the ALJ's findings.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

Here, the record supported the ALJ's findings.  The ALJ explained his findings and cited evidence from the record in doing so.  Because the ALJ's finding that C.C. did not meet Listing 112.05(B) is supported by substantial evidence, I recommend that the Court affirm the Commissioner on this finding.

### 2.    Functional Equivalence

A child's disability "functionally equals" the disability Listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003).  A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(a) & (e)(2).  The

17

ALJ found that C.C. had no extreme limitations or marked limitations.  (Tr. 63-72).  Because no extreme or marked limitations were found, C.C. was found to not functionally equal the disability Listings.  Walker argues that C.C. had marked limitations in the domains of acquiring and using information and in attending and completing tasks.  ECF Doc. 11, Page ID# 944.  The Commissioner counters that substantial evidence supported the ALJ's finding that C.C. had less than marked limitations in these domains.  ECF Doc. 13, Page ID# 956-959.  Because Walker challenges the ALJ's findings on only two of the six domains, it is unnecessary to address the ALJ's findings on the other four domains.

### a.    Acquiring and Using Information

In the domain of acquiring and using information, an ALJ considers how well a child is able to learn information, and how well a child uses the information he has learned.  20 C.F.R. § 416.926a(g).  Relevant portions of the regulations on functional equivalence provide the following guidance:

(1)  General.

(i) Learning and thinking begin at birth. You learn as you explore the world through sight, sound, taste, touch, and smell.  As you play, you acquire concepts and learn that people, things, and activities have names.  This lets you understand symbols, which prepares you to use language for learning. Using the concepts and symbols you have acquired through play and learning experiences, you should be able to learn to read, write, do arithmetic, and understand and use new information.

(ii) Thinking is the application or use of information you have learned.  It involves being able to perceive relationships, reason, and make logical choices.  People think in different ways.  When you think in pictures, you may solve a problem by watching and imitating what another person does.  When you think in words, you may solve a problem by using language to talk your way through it.  You must also be able to use language to think about the world and to understand others and express yourself; e.g., to follow directions, ask for information, or explain something.

The Regulations then set forth age group descriptors for evaluating functional equivalence in the "acquiring and using information" domain as well as some examples of limited functioning in that area:

> (iii) Preschool children (age 3 to attainment of age 6). When you are old enough to go to preschool or kindergarten, you should begin to learn and use the skills that will help you to read and write and do arithmetic when you are older.  For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read.  Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write.  Using words to ask questions, give answers, follow directions, describe things, explain what you mean, and tell stories allows you to acquire and share knowledge and experience of the world around you.  All of these are called "readiness skills," and you should have them by the time you begin first grade.

> (iv) School-age children (age 6 to attainment of age 12).  When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science.  You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions.  You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

The ALJ found that C.C. had less than marked limitations in the domain of acquiring and using information, explaining:

> The claimant received a verbal comprehension composite score of 70, visual spatial index composite score of 84, fluid reasoning score of 74, working memory composite score of 74, processing speed index composite score of 56, and full-scale IQ score of 64 on the WISC-V test in 2016 (Exhibit 20F/30).  The claimant has an IEP in school, history of slightly below average language skills, and below average reading, writing and math skills (Exhibits 5F/17, 9F/14, 20F/24, 28F/2, 5E/3 and 20E/1-2).  However, the claimant received a verbal comprehension composite score of 70, visual spatial index composite score of 86, fluid reasoning score of 85, working memory composite score of 72, processing speed index composite score of 92, and full-scale IQ score of 76 on

the WISC-V test in March 2017 (Exhibit 28F/3 and 5).  The claimant attended preschool with typically developing peers, and there is no evidence of learning barriers and repeated grades (Exhibit 3F/5 and 17F/13).  The claimant generally presented with clear, direct, understandable, and unimpaired speech, and intact memory (Exhibits 9F/8, 18F/5, 19F/5 and 15, and 28F/2).  The claimant was generally doing well overall in school, with improved grades at times (Exhibits 9F/14 and 30F/4).  The claimant knows his first and last name, is aware of genders, and can count to ten, sing songs, tell stories and recognize much of the alphabet.  (Exhibits 9F/8 and 18F/5).

(Tr. 64).

### b.     Attending and Completing Tasks

In the domain of attending and completing tasks, the Commissioner considers how well

the child is able to focus and maintain his attention and how well he begins, carries through, and

finishes activities, including the pace at which he performs activities and the ease with which he

changes them. 20 C.F.R. §416.926a(h).  Relevant portions of the Commissioner's regulations on

functional equivalence provide the following guidance in the domain of attending and

completing tasks:

> (1) General.
>
> (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration.  It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed.  It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.
>
> (ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task.  Adequate attention permits you to think and reflect before starting or deciding to stop an activity.  In other words, you are able to look ahead and predict the possible outcomes of your actions before you act. Focusing your attention allows you to attempt tasks at an appropriate pace.  It also helps you determine the time needed to finish a task within an appropriate time-frame.

20 C.F.R. §416.926a(h)(1).

The Regulations then set forth age group descriptors for evaluating functional equivalence in the "attending and completing tasks" domain as well as some examples of limited functioning in that area:

(iii) Preschool children (age 3 to attainment of age 6).  As a preschooler, you should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects.  You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys.  You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

(iv) School-age children (age 6 to attainment of age 12).  When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments.  You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments).  You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate.  You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.  You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

* * *

(3) Examples of limited functioning in attending and completing tasks.  The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here.  Also, the examples do not necessarily describe a "marked" or "extreme" limitation.  Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

21

(ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

(iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. §416.926a(h)(2)(iv), (v) and (h)(3).

The ALJ found that C.C. had less than marked limitations in the domain of attending and completing tasks. The ALJ explained his finding as follows:

> The claimant has problems paying attention and sitting still, and demonstrated impaired attention and concentration at different times (Exhibits (9F/6 and 19F/5-10). However, the evidence documents that the claimant is determined, and a hard worker (Exhibits 3F/3, 15F/2, and 20E/8). The claimant attends school and does homework (Exhibit 28F/2). The claimant demonstrated interests in many things in a classroom setting, and works well in a classroom setting (Exhibits 17F/40, 29F/12, and 20E/3). The claimant repeatedly presented as alert and oriented, with good eye contact and linear thought processes (Exhibits 4F/12, 9F/3, 5-6, 10, 12 and 14-15, 10F/1-2, 18F/3 and 8, 21F/3, 22F/1-11, 13, 15 and 17, 23F/3, 25F/1-5, 7 and 9, 28F/2, 29F/2, 4-7, 11, 13, and 15, 30F/5, and 33F/1.) The claimant follows two-step directions and is 80% accurate with multistep directions (Exhibit 20F/3 and 16). The claimant enjoys and regularly engages in activities such as fishing, hunting, playing outside, riding bicycles and horses, soccer, tee ball, and wrestling (Exhibits 3F/3, 9F/8, 18F/5, 20F/35, and 26F/2). The claimant plays video games, and uses computers and tablets. (Exhibits 3F/8, 20F/35, 26F/2, and 28F/2).

(Tr. 66).

Walker argues that the ALJ erred in finding that C.C. had less than marked limitations in the domains of acquiring and using information and attending and completing tasks. Walker again contends that these findings were based on the ALJ's "mistake of fact" that C.C. attended school with typically developing peers and that there was no evidence of learning barriers. However, as already explained, these statements were direct quotes from the record evidence.

22

(Tr. 493, 660).  It was not a mistake for the ALJ to consider that evidence, even if other record evidence would have supported the finding Walker sought.

Walker also argues that the ALJ erred in relying on the testimony of two non-examining medical experts in finding less than marked limitations.  Walker asserts that the professionals who examined C.C., "including two state consultative psychologists as well as his teachers and school psychologists, nearly universally found limitation in [C.C.'s] functioning sufficient to rise to the level of marked."  ECF Doc. 11 at Page ID# 944.   Walker's argument is vague, making it difficult to analyze.  For example, she does not mention the names of the professionals or teachers who offered opinions on C.C.'s functioning levels.  Dr. Ickes examined C.C. in 2014.  He opined that C.C. was functioning below the level of same aged peers, but he did not categorize them as marked or less than marked.  (Tr. 548).  Dr. Ickes examined C.C. before he began taking medications to treat his ADHD symptoms.  And a month later, after reviewing more of C.C.'s records, Dr. Ickes issued an addendum questioning his initial opinion, stating that more testing was necessary, and acknowledging that his initial opinion was based, in large part, on information reported by Walker.  (Tr. 551-552).

Two state-agency reviewing psychologists reviewed C.C.'s records in late 2014 and early 2015.  (Tr. 153-155, 167-169).  They opined that he had a marked limitation in the domain of attending and completing tasks.  These opinions were also formed before C.C. started medication therapy and without the benefit of later records showing C.C.'s progress.  Even if the ALJ had adopted these opinions in their entirety, they would not have resulted in a finding that C.C.'s impairments functionally equaled a listing.  The reviewing psychologists opined that he had less than marked or no limitations in the other five domains.  (Tr. 153-155, 169).

In 2017, Ms. Mole, C.C.'s kindergarten teacher, completed a statement regarding C.C.'s overall level of functioning. Ms. Mole opined that C.C. had "an obvious problem" in the domain of acquiring and using information. (Tr. 448). But, she opined that he had only "a slight problem" in the other five domains. (Tr. 449-453). And, she wrote that his ability to stay on task and concentrate was obviously impaired when he didn't take his medication. (Tr. 454). Even if the ALJ had adopted Ms. Mole's opinion in its entirety, it would not have supported a finding that C.C.'s impairments functionally equaled a listing.

The ALJ considered the various opinions in the record. (Tr. 61-63). He determined that the opinions of the medical experts who testified at the hearings were entitled to significant weight. Both were very experienced practitioners, and their opinions were consistent with the evidence and based on the greatest longitudinal perspective. (Tr. 62). Walker has not shown that the ALJ erred in relying on their opinions. *See* 20 C.F.R. § 416.927(e)(2)(1); *Vorholt v. Comm'r of Soc. Sec.,* 409 F.App'x. 883, 887 (6th Cir. 2011).

Because the ALJ's finding that C.C.'s impairments did not functionally equal a listing is supported by substantial evidence and Walker has failed to identify any error of law in the ALJ's analysis, I recommend that the Court affirm the Commissioner's finding on this issue.

## VI.    Recommendation

The ALJ's decision is supported by substantial evidence and Walker has not identified any errors of law in the evaluation of Walker's application for benefits. I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: February 25, 2019

Thomas M. Parker
United States Magistrate Judge

24

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).